Case 1:26-cv-00061-TJC   Document 1   Filed 07/14/26   Page 1 of 111

**FILED**

7/14/2026

Clerk, U.S. District Court
District of Montana
Billings Division

James B. Zouras (pro hac vice forthcoming)
Ryan F. Stephan (pro hac vice forthcoming)
Michael J. Casas (pro hac vice forthcoming)
Gillian Kimmons ((pro hac vice forthcoming)
**STEPHAN ZOURAS, LLC**
222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550
312.233.1560 f
Firm ID: 43734
jzouras@stephanzouras.com
rstephan@stephanzouras.com
mcasas@stephanzouras.com
gkimmons@stephanzouras.com

Keif Storrar
Bradley R. Jones
**DOUBEK, PYFER & STORRAR, PLLP**
307 N. Jackson St.
Helena, Montana 59601
406-442-7830
406-442-7839 f
keif@lawyerinmontana.com
bradley@lawyerinmontana.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| **LYDIA BRESTER, individually and on behalf of all others similarly situated,** | : | **CV-26-61-BLG-TJC** |
| | : | |
| **Plaintiff,** | : | **CLASS ACTION** |
| **v.** | : | **COMPLAINT WITH** |
| | : | **JURY TRIAL DEMAND** |
| **BILLINGS CLINIC** | : | |
| | : | |
| **Defendant.** | : | |

1

## CLASS ACTION COMPLAINT

Plaintiff Lydia Brester ("Ms. Brester") brings this class action lawsuit in her individual capacity and on behalf of all others similarly situated against Billings Clinic ("Defendant") and alleges, upon personal knowledge as to her own actions, her counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     A person's medical information is deeply private. When that information is mishandled or disclosed without authorization, the consequences can be serious, including workplace discrimination, denial of insurance coverage, and other harms tied to the exposure of sensitive health information.[1]

2.     Patient trust depends on confidentiality. When patients believe their health information may be disclosed beyond their medical providers, they may delay or avoid care, increasing the risk of more serious health consequences. Protecting medical information is therefore essential not only to individual patients, but also to public confidence in the healthcare system.

---

[1] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022) https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Tood Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

3.      Healthcare entities collect highly sensitive medical information, including treatment details and unique identifiers that can link a patient to the healthcare provider collecting the information.

4.      As detailed below, Billings Clinic disclosed Plaintiff's and putative Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") and, collectively referred to as "Private Information", to third parties including Google, LLC and StackAdapt, Inc. These unauthorized disclosures continue to harm patients and undermine the confidentiality expected in healthcare.

**A. Billings Clinic Collects Vast Troves of Private Information**

5.      Billings Clinic operates and controls the public website *https://www.billingsclinic.com/* (the "Website"). Billings Clinic directs patients and prospective patients to use the Website to request appointments, find providers and locations, access PatientConnect, review billing and financial-assistance information, search medical conditions and services, and obtain healthcare-related information.

6.      Those interactions are healthcare communications, not ordinary website browsing. They can reveal a user's health concerns, medical needs, provider relationships, appointment-seeking activity, and efforts to obtain or pay for care.

7. Plaintiff and Class Members used the Website with the reasonable expectation that their communications were being exchanged with Billings Clinic, not disclosed to third-party advertising and analytics companies.

8. Unbeknownst to Plaintiff and Class Members, Billings Clinic embedded third-party tracking technologies on the Website, including Google DoubleClick, Google Analytics, and StackAdapt Pixel (collectively, "Tracking Tools"). As implemented, those Tracking Tools caused users' browsers to transmit information about their Website activity to third parties.

9. When operating on the Website, the Tracking Tools captured and transmitted health-related searches and information reflecting users' page views, searches, button clicks, portal-access activity, appointment-related activity, billing-resource visits, URLs, IP addresses, cookie identifiers, device identifiers, and other user-identifying information.

10. As a result, Billings Clinic disclosed Plaintiff's and Class Members' Private Information to third parties, including Google and StackAdapt, without their informed consent or written authorization.

11. The information transmitted through the Tracking Tools was linked to identifying data, including users' IP addresses, cookie identifiers, device identifiers, and other persistent identifiers associated with third-party advertising and analytics systems.

12.    Tracking Tools are pieces of code placed on a website or other digital platform. They can record and transmit information about how a user interacts with the site, including pages viewed, time spent on pages, buttons clicked, search terms entered, form fields accessed, and other website activity.

13.    A user's browser executes these Tracking Tools according to instructions built into the webpage. Website owners can decide where to place the tools, which events to track, and what information will be transmitted to third-party vendors.

14.    By installing and configuring the Tracking Tools, Billings Clinic caused Plaintiff's and Class Members' browsers to transmit health-related communications from the Website to third parties without their knowledge or authorization.

15.    Billings Clinic used the Tracking Tools for advertising, analytics, and marketing purposes. In doing so, Billings Clinic placed its commercial interests above its duty to maintain the confidentiality of patients' Private Information.

16.    Tracking Tools are commonly used to measure website activity, build user profiles, retarget users, and deliver future advertising. Third parties can use the information transmitted from Billings Clinic's Website to associate users with health-related interests, searches, providers, locations, and other Website activity.

17.    The information transmitted through Billings Clinic's Tracking Tools included Private Information reflected in users' Website activity, including patient

status, medical-condition searches, provider-profile views, PatientConnect login clicks, prescription-refill clicks, bill-payment clicks, facility searches, free-text search terms, appointment-related activity, click-to-call activity, and the full URLs of pages visited on the Website. That information was transmitted with personal identifiers, including IP addresses, cookie identifiers, device identifiers, and other identifiers associated with Google, StackAdapt, and other third-party tracking technologies.

18. Because that information was transmitted with persistent identifiers, third parties could connect a user's Website activity to a specific browser, device, account, or user profile. In practical terms, those transmissions allowed third parties to learn that an identifiable person sought or interacted with Billings Clinic healthcare information and record that the person sought confidential medical information. This Private Information is then sold to third parties and marketers who geotag Users and market to them based on their searches discovered through these Tracking Tools.

19. From the transmitted Website activity, Google, StackAdapt, and other third parties could infer sensitive health-related information, including whether a user searched for or viewed information about particular medical conditions, providers, services, or treatment areas, such as cancer, pregnancy, dementia, or HIV.

B. **Billings Clinic's Disclosure of Users' Private Information Without Consent Violates the Law**

20.    Healthcare patients do not reasonably expect their provider to transmit health-related website communications or medical information to undisclosed third parties without their express informed consent or written authorization.

21.    Neither Plaintiff nor Class Members signed a written authorization permitting Billings Clinic to disclose their Private Information to Google, StackAdapt, or any other third-party tracking vendor.

22.    Although Billings Clinic embedded Tracking Tools on its Website, it did not disclose to Plaintiff or Class Members that those tools would transmit their Website communications, identifiers, and Private Information to third parties.

23.    Billings Clinic used the Tracking Tools to support advertising, analytics, marketing, retargeting, and related commercial objectives, while exposing patient communications and Private Information to third-party vendors.

24.    Plaintiff and Class Members were unaware that their Private Information was being transmitted to third parties while they used the Website to communicate with Billings Clinic, seek care, access PatientConnect, schedule appointments, or obtain healthcare-related information.

25.    As detailed below, Billings Clinic owed statutory, regulatory, contractual, and common-law duties to protect the confidentiality, security, and

integrity of Plaintiff's and Class Members' communications and medical information.

26.     Billings Clinic's disclosure of Private Information through the Tracking Tools was inconsistent with HIPAA's privacy framework. HIPAA and its Privacy Rule govern how covered healthcare providers safeguard and disclose individually identifiable health information.

27.     Under the Privacy Rule, covered entities such as Billings Clinic may not use tracking technologies in a manner that results in impermissible disclosures of protected health information to tracking technology vendors or other third parties.

28.     HHS's Office for Civil Rights confirmed that principle in its bulletin, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[2]

---

[2] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited July 7, 2026) (emphasis added).

29.    The HHS Bulletin did not create new obligations. It reiterated existing HIPAA requirements and emphasized that regulated entities have long been prohibited from impermissibly disclosing PHI to tracking technology vendors. *Id.* ("it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors").

30.    Other healthcare providers that used tracking technologies in similar ways have notified patients that their information may have been transmitted to third parties. [3]

31.    Billings Clinic also promised to protect Plaintiff's and Class Members' Private Information and to maintain the confidentiality of patient communications. By collecting, using, and benefiting from that information, Billings Clinic assumed legal and equitable duties to safeguard it from unauthorized disclosure.

32.    Billings Clinic breached these duties by, among other things: failing to review its marketing and website technologies for privacy risks; failing to remove or disable tracking technologies that transmitted Private Information; failing to obtain written authorization before disclosing Private Information to Google, StackAdapt, and other third parties; failing to block unauthorized transmissions through Tracking Tools; failing to warn patients about the disclosures; and failing to

---

[3] *See supra* n.2.

design, monitor, and maintain its Website to protect the confidentiality, security, and integrity of patient Private Information.

33.   As a result, Plaintiff and Class Members suffered injuries including statutory damages, loss of control over their Private Information, diminution in the value of that information, loss of the benefit of their bargain, unjust enrichment and disgorgement of benefits obtained by Billings Clinic, and an ongoing risk of further misuse or disclosure of their Private Information.

34.   Plaintiff therefore seeks relief, requested below, on behalf of herself and similarly situated persons for violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*; negligence; unjust enrichment; violations of the Montana Health Care Information Act, Mont. Code Ann. §§ 50-16-801, *et seq*; invasion of privacy; negligence per se; and violation of Montana's Constitutional Right to Privacy, Mont. Const. art. II, § 10.

## PARTIES

35.   Plaintiff Lydia Brester is a natural person and citizen of Montana. Ms. Brester has been a Billings Clinic patient and has used Billings Clinic's Website, *https://www.billingsclinic.com/*, since at least 2012. She has maintained a Google account since at least 2010. During the relevant period, Ms. Brester used the Website to schedule appointments, request information about medical services, research providers and locations, review financial-assistance resources, and access

PatientConnect. Through those Website interactions, Billings Clinic disclosed Ms. Brester's individually identifiable health information to third parties as described above. Ms. Brester did not know that Billings Clinic was disclosing her health-related Website communications or identifiers to Google, StackAdapt, or other third parties, and she did not consent to or authorize those disclosures.

36.    Defendant Billings Clinic is a nonprofit healthcare system headquartered in Billings, Yellowstone County, Montana. Billings Clinic serves patients throughout Montana, Wyoming, North Dakota, and South Dakota. Billings Clinic Health includes hospitals, regional partnerships with critical-access hospitals and clinics, a physician network of approximately 1,200 physicians and advanced practice providers across approximately 80 specialties, and more than 9,000 employees. Billings Clinic provides primary care, specialty care, cancer treatment, cardiovascular care, neurology, and other medical services.

37.    Billings Clinic is a healthcare provider and covered entity under HIPAA.

## **JURISDICTION AND VENUE**

38.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*. The Court also has supplemental jurisdiction over

Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same facts and form part of the same case or controversy.

39. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class includes at least 100 members, minimal diversity exists, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

40. This Court has personal jurisdiction over Billings Clinic because Billings Clinic is headquartered in this District, regularly conducts business in this District, and made or implemented decisions in this District concerning its Website, Tracking Tools, and the privacy of users' Private Information.

41. Venue is proper in this District under 28 U.S.C. § 1391 because Billings Clinic resides in, conducts business in, and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in, and emanated from, this District.

## COMMON FACTUAL ALLEGATIONS

**C. Background: The Use of Tracking Technologies in the Healthcare Industry.**

42. Healthcare providers increasingly use tracking technologies on their websites and digital platforms. When embedded on healthcare websites, those tools can collect and transmit confidential health-related information, including

information about medical conditions, prescriptions, appointments, providers, and other care-related activity, to third-party vendors without patients' prior informed consent.

43.    Tracking Tools are pieces of code that record how users interact with a website, including pages viewed, buttons clicked, and information entered into forms or search fields. In exchange for installing these tools, website operators receive analytics, advertising-measurement services, and tools for targeting or retargeting visitors through third-party platforms such as Google.

44.    The information captured and transmitted by Tracking Tools varies by website configuration. In healthcare settings, those transmissions can include not only provider names and specialties, but also information entered into appointment or contact forms, such as a user's name, email address, phone number, ZIP code, and city of residence.

45.    These transmissions are commonly linked to an IP address and unique cookie identifiers. Those identifiers allow third-party vendors, including Google, to connect website activity to an existing account or to another persistent user or device profile, even when the user is not signed in.

46.    When connected to treatment information or other protected health information, IP addresses can constitute protected health information under HIPAA.[4]

---

[4] *See Use of Online Tracking Technologies by HIPAA*, *supra*, note 3.

13

47.    Public reporting has documented the widespread use of tracking technologies on hospital, healthcare-provider, and telehealth websites to collect and transmit users' health-related website activity to third parties.

48.    For example, *The Markup* reported that 33 of the nation's 100 largest hospital systems used the Meta Pixel to send Meta data when a visitor clicked a button to schedule a doctor's appointment. [5]

### D. Billings Clinic Installed and Utilized Tracking Technology for the Purpose of Disclosing Plaintiff's and Class Members' Private Information to Third Parties.

49.    Billings Clinic installed and used third-party tracking technologies on its Website, including Google DoubleClick, Google Analytics, and StackAdapt Pixel. As configured, those technologies caused users' browsers to transmit Website communications, identifiers, and Private Information to third parties, including Google and StackAdapt.

50.    On numerous occasions, most recently in May 2026, Plaintiff Lydia Brester accessed Billings Clinic's Website from her computer and used it to schedule appointments, request information about medical services, research providers, review financial-assistance resources, and access PatientConnect.

---

[5] *See* Ash Aryal, *Google Analytics for Healthcare Websites: Harnessing Powerful Insights to Supercharge Your Practice*, Digital Spotlight (October 4, 2024), available at https://www.digitalspotlight.com/google-analytics-healthcare-websites/ (last visited July 7, 2026).

51.     Through the Tracking Tools, Billings Clinic caused Ms. Brester's Website communications and related Private Information to be transmitted to third-party vendors.

**E. Google's Tracking Tools, Including Google DoubleClick and Google Analytics.**

52.     Billings Clinic caused those transmissions to third parties without Ms. Brester's knowledge, consent, or written authorization. By doing so, Billings Clinic breached its duties of confidentiality and disclosed Ms. Brester's Private Information without authorization.

53.     Google is one of the world's largest data and advertising companies. Its services include Google Search, Gmail, YouTube, Google Maps, Google Analytics, Google Ads, and Google DoubleClick.

54.     Google Analytics allows website operators to measure website traffic, user behavior, and engagement. Google DoubleClick is an advertising technology that uses cookies, identifiers, and user communications to measure advertising performance, build audiences, and deliver targeted advertisements.

55.     Billings Clinic installed and used Google Analytics and Google DoubleClick (collectively "Google Tracking Tools") on its Website. As a result, Plaintiff's and Class Members' browsers communicated with Google while they were communicating with Billings Clinic through the Website.

56.     Google's advertising technologies do not operate anonymously. Google expressly confirms that cookies may be used in conjunction with other advertising technologies and that server logs include identifiers that distinguish and, when a user is signed in, may uniquely identify a user. Google states that, in the context of advertising, "we store a record of the ads we serve in our logs," and that those logs "typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely identify you."[6]

57.     Google also uses cookies that can identify users to Google. For example, Google explains that cookies called "SID" and "HSID" contain digitally signed and encrypted records of a user's Google Account ID and most recent sign-in time.[7]

58.     Google uses advertising cookies to target and deliver ads, including on non-Google websites. Google states that the "IDE" cookie is used to show Google ads on non-Google sites, that the "NID" cookie can be used to show ads in Google

---

[6] Google, Advertising & Measurement Technologies, *https://policies.google.com/technologies/ads* (last visited May. 27, 2026).

[7] Google, How Google Uses Cookies & Similar Technologies, *https://policies.google.com/technologies/cookies?hl=en-US* (last visited June 23, 2026).

services for signed-out users, and that the "DSID" cookie is used to identify a signed-in user on non-Google sites.[8]

59.    Independent cookie registers identify Google cookies including __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC as cookies used for targeting, including building profiles of website visitors' interests to deliver relevant or personalized Google advertising through retargeting.

60.    The cookies and identifiers used on Billings Clinic's Website to enable Google DoubleClick, Google Analytics, and related Google Tracking Tools include, among others, IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC. When received by Google, these cookies and identifiers function as persistent personal identifiers that allow Google's advertising and analytics systems to associate Website communications and activity with existing user, browser, device, or account profiles.

61.    Billings Clinic installed Google Tracking Tools, including Google Analytics and Google DoubleClick, on many, if not all, of the webpages within its Website. As configured, those tools caused users' browsers to transmit Private Information, Website communications, and user-identifying information to Google.

62.    While Plaintiff and Class Members navigated Billings Clinic's Website, the Website transmitted information to Google including IP addresses, device

---

[8] *Id.*

identifiers, browser information, cookie identifiers, page URLs, referral information, and information reflecting users' interactions with the Website. Those interactions included pages viewed, buttons and links clicked, forms accessed, information entered or submitted, and the date and time of the communications. This information included identifiers that HIPAA treats as individually identifying when connected to health-related information. [9]

63.    Plaintiff's and Class Members' Website communications and user-identifying information would not have been transmitted to Google through the Google Tracking Tools but for Billings Clinic's decision to install and implement those tools on its Website.

**F.  StackAdapt Tracking Tools, including the StackAdapt Pixel.**

64.    StackAdapt is a programmatic advertising company that operates a demand-side platform, or DSP, through which advertisers purchase digital advertising inventory across websites, mobile applications, and connected television. StackAdapt markets that platform as technology for brand and performance advertising and represents that it processes billions of advertising requests each day. Through those services, StackAdapt enables advertisers to

---

[9] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited May 12, 2026).

identify, segment, and reach users based on inferred interests, online activity, and audience profiles.[10]

65.    StackAdapt also offers the StackAdapt Pixel, a JavaScript tracking tag that advertisers place on their websites. When installed, the Pixel collects information about user activity on the site, including page views, referring pages, user actions, conversions, and custom events. StackAdapt uses that information to create and refine audiences, measure advertising performance, attribute conversions, and support future advertising campaigns directed to particular users or groups of users.

66.    When the StackAdapt Pixel loads on a webpage, the user's browser communicates    with    StackAdapt-controlled    domains,    including tags.srv.stackadapt.com. Those communications can set or read persistent StackAdapt identifiers, including the sa-user-id cookie and related variants such as sa-user-id-v2 and sa-user-id-v3. These identifiers allow StackAdapt to recognize a browser or device across browsing sessions and associate that browser or device with information about pages viewed, locations accessed, and other website activity.[11]

---

[10] StackAdapt, *StackAdapt*, https://www.stackadapt.com (last visited July 7, 2026); StackAdapt Tech Blog, *In-App Advertising and SKAdNetwork*, https://stackadapt.tech/in-app-advertising-and-skadnetwork-ffb871d231d8 (last visited July 7, 2026).

[11] BrainCheck, Inc., *Cookie Policy*, https://braincheck.com/cookie-policy/ (last visited July 7, 2026).

67.     Billings Clinic installed and used StackAdapt Tracking Tools, including the StackAdapt Pixel, on its Website. As configured on Billings Clinic's Website, those technologies caused users' browsers to transmit Website communications, user activity, and identifying information to StackAdapt and other third parties in connection with StackAdapt's advertising, analytics, audience-building, and measurement services.

## G. Defendant's Method of Transmitting Plaintiff's and Class Members' Private Information Through the Tracking Tools.

68.     A web browser is the software application a patient uses to access and communicate with websites over the internet. Patients and other users access web content through browsers on computers, tablets, and smartphones, including commonly used browsers such as Google's Chrome, Mozilla's Firefox, Apple's Safari, and Microsoft's Edge.

69.     A website is hosted on one or more servers that store and deliver the website's content. When a user visits Billings Clinic's Website, the user's browser exchanges electronic communications with the servers that deliver the requested webpages and related content.

70.     Those browser-server communications occur through HTTP or HTTPS requests and responses. A single visit to a website can generate many separate

requests and responses, including requests that transmit cookies and other identifiers associated with the user's browser, device, or session, these include:

- o **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- o **Cookies**: a small text file that can be used to store information on the client device, which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- o **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[12]

71.    When a patient requests information from Billings Clinic's Website, such as a "Request a Provider" page or an appointment-related page, the browser sends a request for that content. The response loads the requested webpage, a "Markup", and displays the page's text, images, links, buttons, forms, and other visible features.

---

[12] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

72.    A webpage includes both visible page content and code that runs in the user's browser, e.g.  Markup and "Client-Side Code."

73.    That browser-based "Client-Side Code" instructs the browser what to do when the page loads or when the user takes a particular action, such as clicking a button, entering a search term, opening a provider profile, or selecting a link to PatientConnect.

74.    Client-Side Code can also instruct the browser to send background transmissions to third-party domains. Those transmissions can occur automatically as the page loads or immediately after a user interacts with the page, without any separate notice appearing to the user.

75.    Billings Clinic's Tracking Tools operated through embedded third-party JavaScript and related tracking code. As implemented on the Website, that code caused users' browsers to send information about their Website communications and interactions to third parties, including Google and StackAdapt.

76.    When a patient visited Billings Clinic's Website, Billings Clinic's servers returned the requested webpage along with the browser-based code necessary to load the page. That code included Tracking Tools that caused additional communications to be sent from the user's browser to third-party tracking domains.

77.    After Billings Clinic's webpage loaded in the patient's browser, the embedded Tracking Tools operated as part of the page code. When the patient viewed

pages, entered searches, selected buttons, opened provider profiles, or clicked links related to appointments or PatientConnect, that code caused the browser to send additional communications to third-party tracking domains, including Google and StackAdapt.

78.    Third-party tracking vendors, including Google, use cookies and other persistent identifiers in users' browsers. When Billings Clinic's Website transmitted information through the Tracking Tools, those identifiers could be transmitted with the communication, allowing the third party to associate the Website activity with a particular browser, device, account, or user profile.

79.    Website owners commonly use third-party tracking vendors to measure user activity, evaluate advertising performance, retarget users, and support marketing campaigns. In the healthcare context, those same tracking functions can disclose communications that reveal a patient's medical interests, providers, services, and appointment-related activity.

80.    A user does not need to take any separate action for these background transmissions to occur. Once Billings Clinic placed and configured the Tracking Tools on its Website, the user's browser followed the webpage instructions and sent the tracked communications and identifiers to third-party vendors while the user interacted with Billings Clinic's Website.

81.    In this case, Billings Clinic's implementation of the Tracking Tools caused Plaintiff's and Class Members' Private Information, Website communications, and identifying information to be copied or transmitted to third parties while they used the Website.

82.    Billings Clinic's Website presents users with a search bar and prominent options including "Request Appointment," "PatientConnect," "Care at Billings Clinic," "Health & Wellness Resources," "Research & Education," "Pay a Bill," "Find a Doctor," and "Locations Near Me." Users can search for a provider or condition, open provider profiles, view information about providers and services, call for an appointment, request an appointment, or access PatientConnect.

//

//

//

//

//

//

//

//

83.    For example, as shown in Figure 1 below, if a patient clicks "Find a Doctor," and searches for "cancer" from the "Site Search" search bar, they will receive a list of links to featured pages and related providers, among other links. From here, a patient can click on a relevant provider's page, request an appointment, or log in to PatientConnect to schedule an appointment. At every stage, Tracking Tools implemented in the Billings Clinic's source code automatically tracks and transmits Users' communications, contemporaneously and without the Users' knowledge.



*Figure 1. Search results for "cancer" in "Site Search" bar*

84.    Figure 2 depicts the tracking activity that occurs when a user searches for "cancer" using the "Site Search" feature shown in Figure 1. At that time, Tracking Tools embedded in Defendant's source code record and transmit information reflecting the user's search term and interaction with the search function, along with associated unique identifiers, to Google for analytics and advertising purposes.



***Figure 2. Tracker contemporaneously transmits contents of "cancer" search to Google.***

85.     Figure 3 shows the user-facing webpage that appears after a user selects a physician from the search results, displaying the physician's profile and options to contact the provider or request an appointment.



*Figure 3. User view after clicking on Dr. Bourgon from "cancer" Site Search results.*

27

86.    Figure 4 depicts the tracking activity that occurs when the physician profile shown in Figure 3 loads. At that time, Tracking Tools embedded in Defendant's Website automatically transmit information about the specific page viewed and the user's interaction and selection, along with unique identifiers, to Google for analytics and advertising purposes.



*Figure 4. Tracker contemporaneously transmits user's action — Clicking on Dr. Bourgon — to Google.*

87.   From the page on Figure 3, if the patient clicks a timeslot in the "Request Appointment" button, the Tracking Tools embedded in Defendant's Website automatically transmits unique identifiers and information reflecting the patient clicked a "Request Appointment," button to Google for analytics and advertising purposes. This disclosure is depicted in Figure 5 below.



*Figure 5. Tracking Tools transmit the "Request Appointment" button to Google.*

88.　　Alternatively, Figure 6, shows when the user elects to login to the private PatientConnect portal to schedule an appointment or otherwise facilitate their healthcare, the Tracking Tools embedded in Defendant's Website automatically transmits unique identifiers and information reflecting the patient clicked a "Login to PatientConnect," button to Google for analytics and advertising purposes.



| pscdl | noapi |
| --- | --- |
| rcb | 10 |
| sr | 1440x900 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;147.0.7727.56\|Not.A%2FBrand;8.0.0.0\|Chromium;147.0.7727.56 |
| uam | |
| uamb | 0 |
| uap | macOS |
| uapv | 14.8.3 |
| uaw | 0 |
| ul | en-us |
| gaf | 2 |
| _s | 4 |
| tag_exp | 0~115938466~115938468~117266400~117884344~117971173~118131808 |
| dl | https://www.billingsclinic.com/care-at-billings-clinic/your-visit/patient-portal/ |
| sid | 1776364436 |
| sct | 1 |
| seg | 1 |
| dr | https://providers.billingsclinic.com/ |
| dt | Patient Portal \| Montana \| Billings Clinic |
| en | call_to_action_panel |
| _c | 1 |
| ep.link_text | Login to PatientConnect |
| ep.link_url | https://billingsclinic.patientportal.us-1.healtheintent.com/ |
| ep.area | CTA Panel |
| ep.action | CTA Button Click |

*Figure 6. Tracking Tools transmit the "Login to PatientConnect" button to Google*

89.    Billings Clinic's Tracking Tools disclosed to Google and other third parties both the substance of users' Website communications and user-identifying information. The disclosed communications included URLs, buttons, links, pages, tabs, search terms, and information entered into Website forms. The identifying information included IP addresses, cookie identifiers, device identifiers, and account-related identifiers.

90.    When a user selected a provider from Billings Clinic's search results, the Website could transmit information to third parties reflecting the selected provider profile, the user's search parameters, and the user's later interactions, including whether the user clicked to call the provider, request an appointment, or access PatientConnect.

91.    Likewise, when a user searched Billings Clinic's Website for treatment, a provider specialty, or a particular condition, including searches such as "breast cancer" or "infectious disease," the Tracking Tools transmitted information reflecting those searches to third parties.

92.    Each transmission also included or was associated with user-identifying information, allowing the third-party recipient to connect the Website activity to a particular browser, device, account, or user profile.

93.    Through these transmissions, Billings Clinic disclosed the specific links and pages users clicked or viewed and information revealing users' past,

present, or future healthcare interests and activity. That information qualifies as protected health information when connected to identifiable users. *See* 18 U.S.C. § 2510.

94. The example above illustrates one path through Billings Clinic's Website. Similar transmissions can occur through many other Website paths involving provider searches, condition searches, appointment-related pages, PatientConnect links, billing resources, and other healthcare-related Website functions.

95. These disclosures occurred without users' informed consent or written authorization.

96. By embedding and configuring the Tracking Tools on its Website, Billings Clinic caused users' browsers to send Private Information and identifying information to third parties while users interacted with Billings Clinic's Website.

97. The information sent through Billings Clinic's Tracking Tools included, among other things, users' PII, PHI, Private Information, Website communications, and other confidential information.

98. When Plaintiff and Class Members used Billings Clinic's Website, the information transmitted to Google and other third parties included medical conditions and specialties searched by users; provider names and profiles viewed by users; facility locations selected or searched; free-text search terms entered into the

Website's search bar; full-string URLs reflecting healthcare-related browsing activity; click-to-call activity for appointment-related communications; clicks to refill prescriptions or pay bills; and personal identifiers transmitted with that activity, including IP addresses and unique cookie identifiers associated with third-party Tracking Tools. The URLs and related event data also reflected when users navigated to pages associated with scheduling appointments, contacting providers, or accessing PatientConnect.

## H. Unique Personal Identifiers, including IP Addresses, are Protected Health Information.

99.    HIPAA does not apply to every entity that receives information, but it does apply to covered healthcare providers, health plans, and healthcare clearinghouses.[13]

100.    The HIPAA Privacy Rule protects individually identifiable health information that a covered entity creates, receives, maintains, or transmits.

101.    HIPAA's de-identification rule identifies categories of information that must be removed before health information can be treated as de-identified. Those identifiers render health information individually identifiable when they identify the

---

[13] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook*, The Markup (June 21, 2022), https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook (stating that "[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations").

individual or when the covered entity has actual knowledge that the information could be used, alone or with other information, to identify the individual. *See* 45 C.F.R. § 164.514(b)(2)(i).

102.   As relevant here, those identifiers include names, dates connected to an individual, email addresses, device identifiers, web URLs, IP addresses, and other unique identifying numbers, characteristics, or codes.

103.   Billings Clinic disclosed Plaintiff's and Class Members' HIPAA identifiers through the Tracking Tools, including names, email addresses, treatment-related dates, IP addresses, device identifiers, web URLs, and persistent tracking identifiers, together with information reflecting services selected, patient status, medical conditions, treatment interests, provider information, appointment-related activity, and other healthcare communications.

104.   HIPAA also treats information as identifiable when the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

105.   In addition to health-related information such as patient status, medical conditions, treatment interests, provider selections, and appointment information, Billings Clinic transmitted users' IP addresses to third parties, including Google, through the Tracking Tools.

106. An IP address is a numerical or alphanumeric address assigned to a device or network connection used to communicate over the internet.

107. IP addresses allow internet communications to be routed to and from particular devices, networks, or access points.

108. Internet service providers, websites, and third-party tracking companies use IP addresses to facilitate communications, distinguish devices or sessions, and associate website activity with a user, device, browser, or location.

109. HIPAA expressly includes IP address numbers among the identifiers that must be removed for health information to be treated as de-identified.

110. HIPAA's de-identification rule also includes "any other unique identifying number, characteristic, or code," in addition to specifically listing IP addresses. *See* 45 C.F.R. § 164.514 (2).

111. Accordingly, when Billings Clinic transmitted patients' IP addresses together with health-related Website activity, those transmissions involved identifiable health information and were inconsistent with HIPAA's privacy and de-identification framework.

112. Billings Clinic also transmitted *unique identifying codes* associated with Plaintiff's and Class Members' Website interactions, including persistent cookie identifiers, device identifiers, and other tracking IDs assigned or used by Google, StackAdapt, and related tracking technologies.

113.   These identifiers include Google advertising and analytics cookies such as IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, as well as StackAdapt identifiers such as sa-user-id. These identifiers allow third-party vendors to distinguish, recognize, and track a browser, device, or user profile across browsing sessions and websites.

114.   Under HIPAA, individually identifiable health information includes not only traditional identifiers such as names or medical record numbers, but also "any other unique identifying number, characteristic, or code" that can identify an individual or for which there is a reasonable basis to believe the information can be used to identify the individual. 45 C.F.R. § 160.103; 45 C.F.R. § 164.514(b)(2)(i).

115.   HIPAA's de-identification standard confirms that health information remains identifiable when it is transmitted with device identifiers, IP addresses, URLs, other unique identifying codes, or when the covered entity actually knows the information could identify an individual either by itself or when combined with other data. 45 C.F.R. § 164.514(b)(2).

116.   Billings Clinic knowingly sent those identifiers together with URLs, page content, search terms, provider information, appointment-related activity, and other health-related Website communications. Because the identifiers accompanied information showing users' health interests, efforts to obtain care, provider

selections, and interactions with Billings Clinic's Website, the transmissions involved individually identifiable health information and PHI.

117.  Because those identifiers were transmitted with information relating to users' health conditions, providers, appointments, treatment inquiries, or other healthcare activity, the transmissions constituted individually identifiable health information and therefore protected health information under HIPAA.

118.  Billings Clinic's disclosures were not anonymous or de-identified. They transmitted health-related Website activity together with identifiers that enabled third parties to recognize, profile, and re-identify Plaintiff and Class Members in connection with their healthcare activity.

## I. Defendant's Privacy Policy and Promises.

119.  During the statutory period, Billings Clinic's Notice of Privacy Practices (the "Notice") represented that it ***never*** shares or discloses users' health information for marketing purposes or for the sale of users' information without first obtaining the users' written authorization.[14] Yet, the Notice does not disclose that health-related data is nonetheless shared with third-party advertising and analytics providers, creating a clear inconsistency between what the policy states and what

---

[14] *See* Billings Clinic, HIPAA Notice of Privacy Practices, https://www.billingsclinic.com/app/files/public/930ebd25-5954-4b2d-8e07-b4a932050ad5/Billings%20Clinic%20HIPAA%20Notice%20of%20Privacy%20Practices.pdf (last visited Apr. 6, 2026).

occurs in practice.[15]

120.   Defendant's Patient Privacy Policy disclosures further represent that information shared for advertising purposes is limited in scope and does not include identifying or health information. Specifically, Defendant states: "It is Billings Clinic's policy to comply with all applicable laws and regulations relating to its use of the information collected on this Site to the extent such laws apply to it and its operations. We will not sell, share, or rent this information to others in ways different from what is disclosed in this Privacy Policy."[16] The Privacy Policy  assures users that "[o]n certain pages of the Site, we may give you the option of providing us with your name, address, phone number, email address, demographic information, preferences and other personal information … [w]e only gather this personal information with your knowledge, permission and participation[,]" and states, "[w]e collect and log the IP address of all visitors to our Site … [w]e may sell, share, or rent this aggregate information to third parties. This sort of information is shared only in aggregate and to maintain your anonymity, we do not associate IP addresses with records containing personal information."[17]

---

[15] *Id*.

[16] *See* Billings Clinic, Site Privacy Policy, https://www.billingsclinic.com/privacy/ (last visited Apr. 6, 2026).

[17] *Id*.

121. The Privacy Policy also acknowledges that Billings Clinic uses "cookies" on its websites and that Billings Clinic's "sponsors and advertisers and their advertising servers ('Ad Servers') may use … those cookies to collect **non-personal** information as a way of measuring the effectiveness of their advertising."[18] However, the Policy reassures users that "[c]ollecting this information [] does not allow [Defendant and its sponsors, advertisers and their advertising servers] to personally identify [users]."[19] These disclosures present the use of tracking technologies as limited to analytics and advertising optimization while assuring users that health information and identifying personal data are not shared with advertising partners.

122. These statements are materially misleading in light of Billing Clinic's actual website practices. As set forth herein, Billing's Clinic's websites deploy third-party tracking technologies that intercept users' interactions with the website, including pages visited, search parameters, and communications entered into website forms. Those interactions are transmitted together with persistent identifiers such as IP addresses, cookies, and device identifiers to third-party analytics and advertising platforms including, but not limited to, Google and StackAdapt.

123. Billings Clinic's privacy disclosures do not adequately inform patients

---

[18] *Id.* (emphasis added).

[19] *Id.*

that their interactions with healthcare provider pages, appointment scheduling tools, or other health-related webpages may be transmitted to third-party advertising and analytics companies through tracking technologies embedded on the website. A reasonable user reviewing Defendant's policies would understand that health-related information is not shared with advertising partners and that any marketing-related disclosures are limited to basic technical identifiers.

124.    By intercepting and transmitting Plaintiff's and Class Members' interactions together with unique identifiers to third-parties, Billings Clinic disclosed information beyond what its privacy disclosures represented. These transmissions occurred without obtaining the written authorization or informed consent that Billings Clinic's own privacy materials represent is required for marketing uses or disclosures of their Private Information.

## J.  Federal Warning on Tracking Codes on Healthcare Websites.

125.    Beyond Billings Clinic's own policies, the federal government has issued guidance warning that tracking code like the Tracking Tools employed by Billings Clinic's may come up against federal privacy law when installed on healthcare websites.

126.    The OCR Bulletin is clear that healthcare organizations regulated under HIPAA may use third-party tracking tools, such as the Billings Clinic's Tracking Tools, in a limited way, to perform analysis on data key to operations. They are not

permitted, however, to use these tools in a way that may expose patients' protected

health information to these vendors. [20]

127.   The Bulletin explains:

Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[21]

128.   The Bulletin discusses the types of harm that disclosure may cause to

the patient:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to***

---

[20] *See Use of Online Tracking Technologies by HIPAA*, *supra*, note 3.

[21] *Id.* (emphasis added).

> ***ensure that they disclose PHI only as expressly permitted
> or required by the HIPAA Privacy Rule.***[22]

129.   Plaintiff and Class Members face the very risks identified by the government. Billings Clinic transmitted information revealing the health conditions they searched for, the providers they sought, their efforts to contact doctors and schedule appointments, the doctors' names, how often they took steps to obtain care for particular conditions, and where they sought medical treatment.

130.   This information is, as described by the OCR Bulletin, "highly sensitive." The Bulletin goes on to make clear how broad the government's view of protected information is as it explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, ***or any unique identifying code.***[23]

131.   Crucially, that paragraph in the government's Bulletin continues:

> IIHI [individually identifiable health information] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services… [for example,] if an individual were looking at a hospital's webpage listing its oncology services to seek

---

[22] *Id.* (emphasis added).

[23] *Id.* (emphasis added).

a second opinion on treatment options for their brain tumor, ***the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care.***[24]

132.    The OCR Bulletin explains that HIPAA-regulated healthcare organizations may use third-party tracking tools, including Google Tracking Tools, only for limited operational analytics. It also makes clear that those tools may not be used in a manner that exposes patients' PHI to tracking vendors.[25]

133.    The federal government is taking these violations of health data privacy and security seriously, as recent high-profile FTC settlements against several telehealth companies demonstrate.[26]

134.    For example, in 2021 and 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook and Google. The FTC also reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. Likewise, the FTC reached a settlement with

---

[24] *Id.* (emphasis added).

[25] *See id.*

[26] Similarly, the State of Montana has similar health data privacy protections, which are also further protected by Montana's Constitutional Right to Privacy.

43

Flo Health, Inc. related to information about fertility and pregnancy that Flo fertility-tracking app was improperly sharing with Facebook, Google and other third parties. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[27]

135.  Even more recently, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch

---

[27] *See FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising, Fed. Trade Comm'n* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising; *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, Fed. Trade Comm'n (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, Fed. Trade Comm'n (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc; *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others*, Fed. Trade Comm'n (June 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google.);    (last visited July 7, 2026).

disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[28]

136.   This is further evidence that the data that Billings Clinic chose to disclose is protected Private Information, and the disclosure of that information was a violation of Plaintiff's and Class Members' rights.

### K. Billings Clinic's Use of Tracking Technologies Violated HIPAA.

137.   Billings Clinic's disclosure of Plaintiff's and Class Members' Private Information to entities like Google also violated HIPAA.

138.   Under federal law, a healthcare provider may not disclose PII, non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[29]

139.   HHS instructs healthcare providers that patient status is protected by HIPAA.

140.   HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care

---

[28] *See Use of Online Tracking Technologies by HIPAA*, *supra* note 3.

[29] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

141.   The Privacy Rule broadly defines protected health information as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

142.   Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (i) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (ii) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

     A.    Names;

        …

     H.    Medical record numbers;

…

J.    Account numbers;

…

M.    Device identifiers and serial numbers;

N.    Web Universal Resource Locators (URLs);

O.    Internet Protocol (IP) address numbers; … and

P.    Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[30]

143.    The HIPAA Privacy Rule requires any "covered entity", which includes health care providers like Defendant, to maintain appropriate safeguards to protect the privacy of PHI. The Privacy Rule also sets limits and conditions on the uses and disclosures of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

144.    Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, is considered PHI.

145.    HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication

---

[30] *See* 45 C.F.R. § 164.514(b)(2)(i)([subsection identified]).

that the individual was treated at a certain clinic, then this information would be PHI."[31]

146.   Consistent with this restriction, HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[32]

147.   Here, as described *supra*, Billings Clinic provided patient information to third parties in violation of the Privacy Rule, and its own Privacy Policy. An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(a)(1) uses or causes to be used a unique health identifier; [or] (a)(2) obtains individually identifiable health information relating to an individual, [or] (a)(3) discloses individually identifiable health information to another person"42 U.S.C. § 1320d-6.

---

[31] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule,* U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html (last visited July 7, 2026).

[32]   *Marketing*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited July 7, 2026).

148. The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

149. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6(b). In such cases, an entity that knowingly obtains individually identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320d-6(b)(1).

150. HIPAA also requires Billings Clinic to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1)—which Billings Clinic failed to do.

151. Under HIPAA, Billings Clinic is forbidden to disclose PII about a patient, potential patient or household member of a patient for marketing purposes without the patient's express written authorization. *See* HIPAA, 42 U.S.C. § 1320;

49

45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

152.   Billings Clinic further failed to comply with other HIPAA safeguard regulations as follows:

a)   Failing to ensure the confidentiality and integrity of electronic PHI that Billings Clinic created, received, maintained and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b)   Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c)   Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Billings Clinic in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d)   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e)   Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3), and;

f) Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

153. In disclosing the content of Plaintiff's and the Class Members' communications, Billings Clinic had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions.

154. Billings Clinic's placement of third-party Tracking Tools on its Website is a violation of Plaintiff's and Class Members' privacy rights under federal law. While Plaintiff does not bring a claim under HIPAA itself, this violation demonstrates Billings Clinic's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

**L. Billings Clinic's Use of Tracking Technologies Violated Montana Law.**

155. In addition to that above, Billings Clinic's disclosure of Plaintiff's and Class Members' Private Information to Google, StackAdapt, and other third parties violated the constitutional, statutory, and common-law privacy protections of the State of Montana. These Montana protections exist independent of HIPAA, are not preempted by HIPAA, and complement HIPAA's requirements.[33]

---

[33] *See Harrington v. Madison Cnty.,* 2021 U.S. Dist. LEXIS 233045, at *4-8 (D. Mont. Dec. 6, 2021).

156. Montana affords its citizens one of the strongest privacy protections in the nation. Article II, § 10 of the Montana Constitution provides that "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Mont. Const. art. II, § 10.

157. Montana courts have repeatedly recognized that medical records and health-related information sit at the very core of Montana's constitutional privacy protection. *See State v. Bilant*, 2001 MT 249, ¶ 17 ("medical records are quintessentially private and deserve the utmost constitutional protection"); *State v. Nelson*, 283 Mont. 231, 242, 941 P.2d 441, 448 (1997); *State v. Goetz*, 2008 MT 296, ¶ 39, 345 Mont. 421, 191 P.3d 489.

158. The Montana Legislature has likewise designated medical records and information as "constitutionally protected material." Mont. Code Ann. § 46-4-301(3). This heightened constitutional status applies regardless of the medium through which the medical information is created, maintained, or disclosed, including electronic systems, digital communications, and web-based interactions between patients and their healthcare providers.

159. Montana's constitutional right of privacy is not limited to intrusions by governmental actors. Montana recognizes an independent common-law tort of invasion of privacy that protects individuals against wrongful intrusions upon their

private activities, including their private medical activities, by private entities such as Billings Clinic. The protections of Montana law extend fully to intrusions accomplished through electronic means, including through third-party tracking technologies embedded on healthcare websites.

160. Beyond its constitutional protections, Montana enacted the Montana Health Care Information Act ("MHCIA"), Mont. Code Ann. §§ 50-16-801, *et seq.*, specifically to safeguard the confidentiality of health care information held by HIPAA-covered healthcare providers operating in Montana. The MHCIA imposes affirmative duties on healthcare providers to safeguard health care information and to restrict its disclosure absent patient authorization.

161. In enacting the MHCIA, the Montana Legislature expressly found:

   a. "health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy and health care or other interests," Mont. Code Ann. § 50-16-801(1);

   b. HIPAA "provide[s] significant privacy protection for health care information with respect to health care providers subject to HIPAA," Mont. Code Ann. § 50-16-801(2); and

   c. "it is in the best interest of the citizens of Montana to have certain requirements, with respect to the use or release of health care

information by health care providers, that are more restrictive than or additional to the health care privacy protections of HIPAA," Mont. Code Ann. § 50-16-801(4).

162. The MHCIA thus reflects a considered legislative judgment that Montana patients are entitled to privacy protections that go beyond the federal floor set by HIPAA. Montana law is intentionally designed to be additive to, and more restrictive than, HIPAA, not duplicative of it.

163. The MHCIA further provides an express civil remedy for aggrieved persons. Mont. Code Ann. § 50-16-817 authorizes an aggrieved person to bring a civil action, recover actual damages, obtain statutory damages up to $5,000 per violation, and recover reasonable attorneys' fees.

164. The MHCIA is not the exclusive remedy for the unauthorized disclosure of health care information by Montana healthcare providers. As the United States District Court for the District of Montana has recognized, "Nothing within the text or legislative history of the MHCIA indicates that the Legislature intended for it to serve as an exclusive civil remedy." *Harrington,* 2021 U.S. Dist. LEXIS 233045, at *7-8. Accordingly, MHCIA claims may proceed alongside constitutional, common-law, and other statutory claims arising from the same unauthorized disclosures.

165. HIPAA does not preempt Montana's constitutional, statutory, or common-law privacy protections. To the contrary, HIPAA expressly preserves state laws that are more stringent than, or complementary to, its own protections. *See* 42 U.S.C. § 17951(a); 42 U.S.C. § 1320d-7; 45 C.F.R. § 160.203; *see also Harrington*, 2021 U.S. Dist. LEXIS 233045, at *4-8 (recognizing that HIPAA does not preempt Montana's independent constitutional, statutory, and common-law privacy protections and that a plaintiff may rely on HIPAA to demonstrate the wrongfulness of a disclosure without asserting a private right of action under HIPAA).

166. As a Montana healthcare provider serving patients throughout Montana, Wyoming, North Dakota, and South Dakota, and as a HIPAA-covered entity headquartered in Billings, Montana, Billings Clinic is fully subject to Montana's constitutional, statutory, and common-law privacy protections.

167. Plaintiff and Class Members had a reasonable expectation of privacy, grounded in the Montana Constitution, the MHCIA, HIPAA, Montana common law, and Billings Clinic's own Notice of Privacy Practices and Site Privacy Policy, that their communications with Billings Clinic through its Website would not be intercepted or disclosed to Google, StackAdapt, or any other third-party advertising or analytics vendor.

168. That expectation of privacy is objectively reasonable. Montana citizens, like patients everywhere, do not expect that a search for "breast cancer" on their

hospital's website, a click on their oncologist's profile, or a login to their patient portal will be surreptitiously transmitted to a global advertising company for use in commercial retargeting.

169. Billings Clinic violated Plaintiff's and Class Members' Montana privacy rights by intentionally embedding, configuring, and maintaining the Tracking Tools on its Website; by programming its Website to transmit patient communications and identifiers to Google, StackAdapt, and other third parties; by failing to obtain informed, written authorization from Plaintiff and Class Members; and by affirmatively misleading Plaintiff and Class Members through its Notice of Privacy Practices and Site Privacy Policy about the nature and scope of information shared with third parties.

170. Billings Clinic's violations of Montana law were not incidental to its business operations. They were the intended consequence of a commercial strategy designed to monetize patient interactions with the Website for advertising, retargeting, and analytics purposes. Billings Clinic's pursuit of that commercial strategy came at the direct expense of Plaintiff's and Class Members' Montana constitutional, statutory, and common-law privacy rights.

171. Because Billings Clinic's disclosures were undertaken in violation of the Montana Constitution, the MHCIA, and Montana common-law privacy protections, the interceptions and disclosures alleged in this Complaint were made

for the purpose of committing tortious acts in violation of the laws of the State of Montana, in addition to the tortious and criminal acts under federal law described above.

## M. Defendant Violated Industry Standards.

172.  A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship, it is a cardinal rule.

173.  The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

174.  AMA Code of Ethics Opinion 3.1.1 provides that "[p]rotecting information gathered in association with the care of the patient is a core value in health care…. Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

175.  AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data

57

that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

176.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[34]

## N. Users' Reasonable Expectation of Privacy.

177.    Plaintiff and Class Members were aware of Billings Clinic's duty and assurances of confidentiality when they sought medical services from Defendant.

178.    Indeed, when Plaintiff and Class Members provided their PII/PHI to Billings Clinic, they each had a reasonable expectation that the information would remain private, and that Billings Clinic would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

179.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

180.    For example, a recent Consumer Reports study shows that 92% of

---

[34]    Am. Med. Ass'n, *Code of Medical Ethics ch. 3*, https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (last visited July 7, 2026).

Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[35]

181. Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class Members.

182. Plaintiff's and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Billings Clinic's status as a healthcare provider, Defendant's obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Billings Clinic's express promises of confidentiality.

## O. Plaintiff's and Class Members' Private Information Has Substantial Financial Value.

183. Plaintiff and Class Members' Private Information has substantial value. Billings Clinic's disclosure and interception harmed Plaintiff and the Class Members

---

[35] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds,* Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

by not compensating them for the value of their Private Information and diminishing the value of their Private Information.

184.   The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the technology economy.

185.   Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

186.   Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, the damage caused can be irreparable.

187.   The value of health data is well-known, and various reports have been conducted to identify its value.

188.   Specifically, in 2023, the Value Examiner published a report titled "Valuing Healthcare Data." The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is

priced at fair market value to mitigate any regulatory risk."[36]

189.   Trustwave Global Security published a report entitled "The Value of Data." With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next-highest-value record (a payment card).[37]

190.   The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[38]

191.   Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[39]

---

[36]   *See   Valuing   Healthcare   Data* (white   paper),   Health   Capital   (Dec. 2017), https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcar e%20Data.pdf.

[37]   *See   Healthcare   Data:   The   New   Prize   for   Hackers*,   Imprivata   (Nov.   30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers.

[38] *See* Alice Park & Brian Everstine, *How the Medical-Data Industry Sells Your Records — and Why Doctors Can't Stop It*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/.

[39] *See* Lauren Hirsch, *Hospital Execs Say They're Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

192. The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold evidences the value of PHI.

193. These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

194. Google's and others' practices of using such information to package groups of people as "Lookalike Audiences"[40] and similar groups and selling those packages to advertising clients demonstrates the financial worth of that data.

195. Data harvesting is the fastest growing industry in the nation.

196. As software, data mining and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

197. Consumer data is so valuable that some have proclaimed that data is the new oil.

198. Between 2016 and 2018, the value of information mined from Americans increased by 85% for Facebook and 40% for Google.

199. Overall, the value internet companies derive from Americans' personal data increased almost 54% and is only expected to continue growing in the coming

---

[40] *Lookalike audiences*, Display & Video 360 Help, https://support.google.com/displayvideo/answer/15612398?hl=en (last visited July 7, 2026) ("Lookalike audiences are groups of people that share characteristics with others on an existing 'seed' list … find other potential customers with similar characteristics").

years.

200.   Conservative estimates suggest that in 2018, Internet companies earned $202 per American user. By 2020, that value had jumped to approximately $420 per adult American user each year, making personal data sales a nearly $140 million industry.[41]

201.   In 2025, the global big data market was projected to be valued at approximately $224.46 billion.[42]

202.   As to health data specifically, as detailed in an article in Canada's National Post:

> As part of the multibillion-dollar worldwide data brokerage industry, health data is one of the most sought-after commodities. De-identified data can be re identified (citing https://www.nature.com/articles/s41467-019-10933-3/ ) and brazen decisions to release records with identifiable information (citing https://www.wsj.com/articles/hospitals-give-tech-giants-access-todetailed-medical-records-11579516200?mod=hp_lista_pos3 ) are becoming commonplace).[43]

---

[41] Pawtocol, *How Much Is User Data Worth?*, Medium (Mar. 16, 2020), https://pawtocol.medium.com/how-much-is-user-data-worth-f2b1b0432136.

[42] Market Data Forecast, *Big Data Market Size, Share, Trends & Analysis, 2033* (Sept. 25, 2025), https://www.marketdataforecast.com/market-reports/big-data-market (projecting the global big data market to grow from a 2024 value of USD 199.63 billion to an estimated USD 224.46 billion in 2025).

[43] *See* Iris Kulbatski, *The Dangers of Electronic Health Records*, National Post (Feb. 26, 2020), https://nationalpost.com/opinion/iris-kulbatski-the-dangers-of-electronic-health-records.

203. Further demonstrating the financial value of Class Members' medical data, CNBC has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said via phone. "Often, once a day or more."
>
> * * *
>
> [H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other data to identify individuals at higher risk of diseases and then raise their health premiums, or to target advertising to individuals.[44]

204. The same CNBC article also explained:

> De-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers. Just one company alone, IQVIA, said on its website that it has access to more than 600 million patient records globally that are

---

[44] *See* Lauren Hirsch, *Hospital Execs Say They're Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

nonidentified, much of which it accesses through provider organizations. The buyers, which include pharma marketers, will often use it for things like clinical trial recruiting But hospital execs worry that this data may be used in unintended ways, and not always in the patient's best interest.

205. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own needs. For instance, the health data Google collects could eventually help it micro-target advertisements to people with particular health conditions. Policymakers are proactively calling for a revision and potential upgrade of the health privacy rules known as HIPAA, out of concern for what might happen as tech companies continue to march into the medical sector.[45]

206. Time Magazine similarly, in an article titled, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, referenced the "growth of the big health data bazaar," in which patients' health information is sold. It reported that:

[T]he secondary market in information unrelated to a patient's direct treatment poses growing risks, privacy experts say. That's because clues in anonymized patient dossiers make it possible for outsiders to determine your identity, especially as computing power advances in the future.[46]

207. This economic value has been leveraged largely by corporations who

---

[45] *Id.*

[46] *See* Alice Park & Brian Everstine, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/.

pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[47]

208. There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

209. In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

210. Billings Clinic gave away Plaintiff's and Class Members' communications and transactions on its Website without permission.

211. The unauthorized access to Plaintiff's and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website Users, including Plaintiff and Class Members.

212. Plaintiff has a continuing interest in ensuring that her future communications with Billings Clinic are protected and safeguarded from future unauthorized disclosure

---

[47] *See 10 Apps for Selling Your Data for Cash,* WalletHacks, https://wallethacks.com/apps-for-selling-your-data/ (last visited June 23, 2026).

**P. Defendant was Enriched and Benefitted from the Use of Tracking Tools and Unauthorized Disclosures.**

213.  Billings Clinic intentionally deployed and configured the Tracking Tools on its Website to disclose its patients' Private Information to third parties for marketing, commercial advantage, and profit, a benefit Billings Clinic could obtain only through the knowing disclosure of that Private Information.

214.  In exchange for disclosing the Personal Information of its patients, Billings Clinic is compensated by third party vendors like Google in the form of enhanced advertising services and more cost-efficient marketing on their platforms.

215.  After receiving individually identifiable patient health information communicated on Billings Clinic Website, third party vendors forward this data, and its analysis of this data, to Defendant.

216.  Billings Clinic then uses this data and analysis for its own commercial purposes that include understanding how Users utilize its Website.

217.  Billings Clinic also receives an additional commercial benefit from using third party Tracking Tools, such as the Google DoubleClick, namely being able to serve more targeted advertisements to existing and prospective patients on their Google accounts.

218.  Google advertises its Tracking Tools as follows: "when you visit a website that uses [our] advertising services … your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and

your IP address. We may use the IP address, for example, to identify your general location, to measure the effectiveness of ads, and, depending on your settings, to improve the relevance of the ads you see. We may also set cookies on your browser or read cookies that are already there."[48]

219.  Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions.  Retargeting operates through code and tracking technology placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[49]

220.  The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a healthcare website back to Google via the Tracking Technologies and the tag embedded on, in this case, Billings Clinic's Website. For example, when a User searches for doctors, medical conditions or treatment on Billings Clinic's Website, that information is sent to Google Ads via the conversion tracking tag and associated cookies. Google can then use its data on the User to find more users to click on a Billings Clinic ad and ensure that those users targeted are more likely to convert.[50]

---

[48] *How Google uses information from sites or apps that use our services*, Privacy & Terms, *https://policies.google.com/technologies/partner-sites* (last visited July 7, 2026).

[49] The Complex World of Healthcare Retargeting, Medico Digital (July 10, 2023), https://www.medicodigital.com/insights/the-complicated-world-of-healthcare-retargeting/ (last visited July 7, 2026).

[50] *See,* WordStream, *How Does Google Remarketing Work?* (explaining that placing Google remarketing code or tag on a website allows advertisers to add visitors to remarketing audiences via browser cookies

221.   Through this process, the Google Tracking Tools embedded on Billings Clinic's Website record and transmit information about a User's activity when the User loads and interacts with the Website. As Google explains, when a User completes or triggers a defined action on a website, the Google tag or conversion tracking code reads existing cookies and sends information about the page visited and the action taken back to Google for advertising and measurement purposes. The data transmitted includes the URLs of pages visited and the specific actions taken on the website, which, in the healthcare context, may reflect an individual's interest in or pursuit of medical services.[51]

222.   Plaintiff's and Class Members' Private Information have considerable value as highly monetizable data, especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

**REPRESENTATIVE PLAINTIFF LYDIA BRESTER'S EXPERIENCES**

223.   As a condition of receiving Billings Clinic's services, Plaintiff Lydia Brester disclosed Private Information to Billings Clinic on numerous occasions, most recently in May 2026.

---

and then serve targeted Google Ads to those visitors as they browse other sites to increase conversions), https://www.wordstream.com/google-remarketing (last visited July 7, 2026).

[51] *Id*.

224. Ms. Brester accessed Billings Clinic's Website on her phone, tablet, and computer to receive healthcare services from Defendant and at Defendant's direction.

225. During the relevant time period, when the Billings Clinic's Tracking Tools were present, Ms. Brester used Billings Clinic's website, https://www.billingsclinic.com/, to schedule appointments, request information on specific medical services, research providers, review financial assistance resources, and login to PatientConnect. The full scope of Billings Clinic's interceptions and disclosures of Ms. Brester's communications to third parties including but not limited to Google and can only be determined through formal discovery. However, Billings Clinic intercepted and transmitted to third parties via Tracking Tools at least the long-URLs or substantially similar URL communications about Ms. Brester prospective healthcare identified in **Exhibit A.**[52]

226. Contemporaneously with its interception and transmission of Ms. Brester's communications on *https://www.billingsclinic.com/*, Billings Clinic also disclosed to third parties Ms. Brester's personal identifiers, including but not limited to her IP addresses, cookie identifiers, device identifiers and account numbers.

---

[52] **Exhibit A** contains Plaintiff's protected health information which is confidential and may not be publicly disclosed. Immediately after the filing of the instant complaint, Plaintiff will move for leave to file Exhibit A under seal.

227. Billings Clinic never notified Ms. Brester that it and third parties would put individually identifiable patient health information about her past, present, or future health conditions to their own commercial uses. Ms. Brester never provided informed consent or written permission allowing Billings Clinic to send individually identifiable patient health information about her past, present, or future health conditions to third parties. Ms. Brester never provided informed consent or written permission allowing Billings Clinic or any third party to put individually identifiable patient health information about her past, present, or future health conditions to their own commercial use.

228. After using Billings Clinic's Website and communicating her Private Information, specifically, after using Billings Clinic's Website to search for an ophthalmologist, Ms. Brester began receiving targeted advertisements related to ophthalmology. Ms. Brester did not consent to Billings Clinic's use or disclosure of her Private Information for advertising or marketing purposes.

229. Google and StackAdapt maintain records of the advertisements they serve to individual users and their devices. Ms. Brester will seek in discovery the records reflecting the ads related to her medical conditions and treatments that were delivered to her and the Class Members, along with associated targeting and delivery data, to fully inform the scope of their claims and damages and the ways in which their Private Information was used for advertising.

230.    Ms. Brester provided Private Information to Billings Clinic and trusted that the information would be safeguarded according to Billings Clinic's policies and state and federal law.

231.    Ms. Brester reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Billings Clinic, and that such communications would not be transmitted to or intercepted by a third party.

232.    By doing so without her consent, Billings Clinic breached its Notice of Privacy Practices and Online Privacy Policy and unlawfully disclosed Ms. Brester's Private Information.

233.    Plaintiff Lydia Brester suffered damages in form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages and (iv) the continued and ongoing risk to her Private Information.

234.    Plaintiff Lydia Brester has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Billings Clinic's possession, is protected and safeguarded from future unauthorized disclosure.

**TOLLING**

235.    Any statute of limitations applicable to Plaintiff's claims have been tolled by Billings Clinic's actual knowledge and efforts to conceal the

misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and the Class Members had no obvious way to discover Billings Clinic's deception and unlawful conduct.

236. Plaintiff and the Class Members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Billings Clinic was acting unlawfully. The earliest Plaintiff or a reasonable user of Billings Clinic's Website could have learned of Billings Clinic's conduct was approximately March 2026, when Plaintiff's counsel, through an independent technical investigation, identified Tracking Tools operating on Billings Clinic's Website and transmitting user healthcare communications and identifiers to third parties. Billings Clinic's alleged representations were material to Plaintiff and the Class Members at all relevant times. Before the expiration of any applicable statute of limitations period, Plaintiff and the Class Members could not have discovered Defendant's wrongful conduct through the exercise of reasonable diligence because Billings Clinic's incorporation of the Tracking Tools is highly technical, undiscoverable by ordinary users of Billings Clinic's Website, and Defendant made no disclosures or other indications that would inform a reasonable user of its Website that Billings Clinic was intercepting and disclosing Users' individually-identifiable health information to third parties.

237. At all relevant times, Billings Clinic was, and still is, under a continuous duty to disclose to Plaintiff and the Class Members the true nature of the disclosures being made and the lack of an actual "requirement" before it shares Plaintiff's and the Class Members' data with third parties, including but not limited to, Google and StackAdapt.

238. Billings Clinic's knowingly, actively, affirmatively or negligently concealed the facts alleged herein.

239. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Billings Clinic's concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## **CLASS ACTION ALLEGATIONS**

240. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated (the "Class") pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

241. The Class that Plaintiff seeks to represent is defined as follows:

> All people who used Billings Clinic's Website and who
> had their Private Information disclosed or transmitted
> to Google or any other unauthorized third party.

242. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries; any entity in which Defendant has a controlling interest; any Defendant officer or director, any successor or assign; Defendant's and Plaintiff's attorneys in

74

this action, their staff and immediate family; and any Judge who adjudicates this case, including their staff and immediate family.

243. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

244. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(1), because the Class Members are so numerous and geographically dispersed that their joinder would be impracticable. Plaintiff believes that the business records of Billings Clinic, Google and StackAdapt will permit the identification of thousands of people meeting the Class definition.

245. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(2), because there are many common questions of facts and law concerning and affecting the Class Members, including:

a. Whether Billings Clinic had a duty to protect and refrain from disclosing the Class Members' individually identifiable health information;

b. Whether Billings Clinic intentionally disclosed the Class Members' individually identifiable health information to third parties including but not limited to Google;

c. Whether the Class Members consented to Billings Clinic disclosure of their individually identifiable health information

to third parties, including but not limited to Google;

d.  Whether the Class Members are entitled to damages because of Billings Clinic's conduct; and

e.  Whether Billings Clinic's knowing disclosure of its patients' individually identifiable health information to third parties, including but not limited to Google is "criminal or tortious" under 18 U.S.C. § 2511(2)(d).

246.  Plaintiff also anticipates that Defendant will raise defenses common to the Class.

247.  This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(3), because Plaintiff's claims are typical of the claims belonging to the Class Members. Plaintiff and the Class Members were harmed by the same wrongful conduct perpetrated by Billings Clinic that caused their individually identifiable health information to be intercepted and disclosed without notice or consent. As a result, Plaintiff's claims are based on the same facts and legal theories as the Class Members' claims.

248.  This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(4), because Plaintiff will fairly and adequately protect the interests of all the Class Members, there are no known conflicts of interest between Plaintiff and the

Class Members, and Plaintiff has retained counsel experienced in the prosecution of complex litigation.

249.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(3), because common questions of law and fact predominate over questions affecting the individual Class Members, because a class action is superior to other available methods for the fair and efficient adjudication of these claims and because important public interests will be served by addressing the matter as a class action. Further, the prosecution of separate actions by the individual Class Members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant and substantially impair the Class Members' ability to protect their interests.

250.   The State of Montana has a significant interest in regulating the conduct of businesses operating within its borders.

251.   Montana, which seeks to protect the rights and interests of Montana and all residents and citizens of the United States against a company headquartered and doing business in Montana, has a greater interest in the claims of Plaintiff and the Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

252.   The principal place of business and headquarters of Billings Clinic, located in Montana, is the "nerve center" of its business activities, the place where

its high-level officers direct, control and coordinate its activities, including major policy, financial and legal decisions.

253.   Upon information and good faith belief, Billings Clinic's actions and corporate decisions surrounding the allegations made in the Complaint were made from and in Montana.

254.   Billings Clinic's breaches of duty to Plaintiff and Class Members emanated from Montana.

255.   Application of Montana law to the Class with respect to Plaintiff's and the Class Members' common law claims is neither arbitrary nor fundamentally unfair because, further to choice of law principles applicable to this action, the common law of Montana applies to the nationwide common law claims of all Class Members. Additionally, given Montana's significant interest in regulating the conduct of businesses operating within its borders, and that Montana has the most significant relationship to Billings Clinic, as it is headquartered in Montana, there is no conflict in applying Montana law to non-resident consumers and Class Members. Alternatively, and/or in addition to Montana law, the laws set forth below apply to the conduct described herein.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2510, *et seq.***

256.   Plaintiff incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

257.   The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

258.   The ECPA protects both the sending and receipt of communications.

259.   The ECPA provides a private right of action to any person whose wire or electronic communications are intercepted. 18 U.S.C. § 2520(a).

260.   Billings Clinic intentionally intercepted electronic communications that Plaintiff and the Class Members exchanged with Defendant through Tracking Tools installed on Billings Clinic's Website.

261.   The transmissions of data between Plaintiff and the Class Members and Billings Clinic qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

262.   Billings Clinic contemporaneously intercepted and transmitted Plaintiff's and the Class Members' communications to third parties, including but not limited to Google and StackAdapt.

263.   The intercepted communications include:

a. The content of Plaintiff's and the Class Members' communications relating to appointments with medical providers;

b. The content of Plaintiff's and the Class Members' communications relating to specific healthcare providers, conditions, treatments, diagnoses, prognoses, prescription drugs, symptoms, insurance, and payment information;

c. Button/menu selections and/or content typed into free text boxes; and

d. Full-string URLs that contain any information concerning the substance, purport, or meaning of patient communications with their health entities.

264. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Billings Clinic and third parties, including but not limited to, Google, use to track Plaintiff's and the Class Members' communications;

b. Plaintiff's and the Class Members' browsers;

c. Plaintiff's and the Class Members' computing devices,

including desktop computers, laptop computers, tablets and smartphones;

d. Billings Clinic's web-servers or webpages where Tracking Tools are present;

e. Google and StackAdapt's web-servers; and;

f. The Google and StackAdapt's advertising and analytics scripts embedded in Billings Clinic's Website, which intercept and transmit Plaintiff's and the Class Members' communications to third parties.

265. Google, StackAdapt, and other third party advertising vendors are not parties to Plaintiff's and the Class Members' communications with Billings Clinic.

266. Billings Clinic transmits the content of Plaintiff's and the Class Members' communications to third parties, including but not limited to, Google and StackAdapt through the surreptitious redirection of those communications from Plaintiff's and the Class Members' computing devices.

267. Plaintiff and the Class Members did not consent to third parties' acquisition of their appointment and treatment communications with Billings Clinic.

268. Third parties like Google did not obtain legal authorization to obtain Plaintiff's and the Class Members' communications with Billings Clinic relating to communications with their health entities.

269. Google and StackAdapt did not require Billings Clinic to obtain the lawful rights to share the content of Plaintiff's and the Class Members' communications relating to appointments and treatments.

270. Any purported consent that Google and StackAdapt received from Billings Clinic to obtain the content of Plaintiff's and the Class Members' communications was not valid.

271. In disclosing the content of Plaintiff's and the Class Members' communications relating to treatments, conditions and appointments, Billings Clinic had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions, as follows:

a. The unauthorized disclosure of individually identifiable health information is tortuous in and of itself, regardless of whether the means deployed to disclose the information violates the ECPA or any subsequent purpose or use for the acquisition. Billings Clinic intentionally committed a tortious act by disclosing individually identifiable health information without authorization to do so.

b. The unauthorized acquisition of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6, regardless of any subsequent purpose or use of the individually identifiable health information. Billings Clinic intentionally violated

42 U.S.C. 1320d-6 by intentionally disclosing individually identifiable health information without authorization.

c. A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, is a crime punishable by fine or imprisonment with *increased penalties* where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain." Billings Clinic intentionally violated the enhanced penalty provision of 42 U.S.C. § 1320d-6 by disclosing the individually identifiable health information "with intent to sell transfer or use" it for "commercial advantage [or] personal gain."

d. Trespass upon Plaintiff's and the Class Members' personal and private property via the placement of the Tracking Tools on Plaintiff's and the Class Members' personal computing devices is tortious.

e. Billings Clinic's affirmative misrepresentations to Users through its cookie banner, which falsely assured Users that cookies were not used for tracking purposes despite the simultaneous deployment of multiple third-party tracking technologies, further evidencing Billings Clinic's intent to conceal its unauthorized disclosures and

to deprive Users of the opportunity to make informed decisions regarding their Private Information.

272. In addition to the federal laws identified above, Billings Clinic's interception and disclosure of Plaintiff's and Class Members' health-related communications were undertaken for the purpose of committing tortious acts under the laws of the State of Montana, including but not limited to:

   a. violation of Plaintiff's and Class Members' rights under Article II, § 10 of the Montana Constitution, which independently guarantees the right to privacy and specifically protects medical information as "constitutionally protected material," Mont. Code Ann. § 46-4-301(3);

   b. violation of the Montana Health Care Information Act, Mont. Code Ann. §§ 50-16-801, et seq., which restricts the disclosure of health care information by HIPAA-covered health care providers absent patient authorization and provides an express civil remedy for aggrieved persons;

   c. common-law invasion of privacy under Montana law, which protects individuals from wrongful intrusions into their private activities in a manner that would cause mental suffering, shame, or humiliation to a person of ordinary sensibilities; and

d. negligence and negligence per se under Montana law, based on Billings Clinic's breach of statutory and regulatory duties to safeguard patient health care information.

273. Montana law independently protects Plaintiff's and Class Members' privacy interests in their health care information. HIPAA does not preempt Montana's constitutional, statutory, or common-law privacy protections; rather, those protections complement HIPAA.[53]

274. Because Billings Clinic's interceptions constitute tortious acts in violation of the Constitution and laws of the State of Montana, as well as tortious violations of the laws of the United States, the party exception in 18 U.S.C. § 2511(2)(d) does not shield Billings Clinic from liability under the ECPA.

275. Billing's intent to disclose Plaintiff's and Class Members' Private Information to Google and other third parties existed before each interception because Billings affirmatively chose to deploy, configure, and maintain Tracking Tools on its Website that were designed to capture and transmit patient communications for Billings Clinic's marketing, commercial advantage, and profit.

276. To the extent Billings Clinic contends it was a party to the communications at issue, the party exception in 18 U.S.C. § 2511(2)(d) does not bar liability because Billings Clinic intercepted Plaintiff's and Class Members'

---

[53] *See Harrington v. Madison Cnty.*, 2021 U.S. Dist. LEXIS 233045, at *4-8 (D. Mont. Dec. 6, 2021).

85

communications for the purpose of committing criminal and tortious acts, including knowingly disclosing individually identifiable health information to third parties in violation of 42 U.S.C. § 1320d-6(a)(3), and doing so for commercial advantage and personal gain.

277. Plaintiff's and Class Members' information that Billings Clinic disclosed to third parties qualifies as individually identifiable health information, and Billings Clinic violated Plaintiff's expectations of privacy, which constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Billings Clinic intentionally used the wire or electronic communications to increase its profit margins. Billings Clinic specifically used the Tracking Tools and other codes to track and utilize Plaintiff's and Class Members' Private Information for its own financial benefit.

278. Plaintiff and Class Members did not authorize Billings Clinic to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy via Tracking Tools. Plaintiff and Class Members had a reasonable expectation that Billings Clinic would not re-direct their communications content others attached to their personal identifiers in the absence of their knowledge or consent.

279. Any purported consent that Billings Clinic received from Plaintiff and Class Members was not valid.

280. Billings Clinic's scheme or artifice to defraud in this action further consists of the false and misleading statements and omissions in its privacy policies set forth above.

281. Billings Clinic acted with the intent to defraud in that it willfully invaded Plaintiff's and the Class Members' property rights, including their:

      a. Property right to the confidentiality of their Private Information, their right to determine whether such information remains confidential and their exclusive right to determine who may collect and/or use such information for marketing purposes; and

      b. Property right to determine who has access to their computing devices.

282. Billings Clinic acted with the intent to defraud in that it willfully invaded and took Plaintiff's and the Class Members' property:

      a. With knowledge that (1) Billings Clinic did not have the right to share Private Information without written authorization; (2) courts have determined that a healthcare providers' use of similar Tracking Tools gave rise to claims for invasion of privacy and violations of state criminal statutes; (3) a reasonable user would not understand that Google and other third party vendors were collecting their Private Information based on their activities on Billings Clinic's

Website; and (4) the subsequent use of health information for advertising was a further invasion of Plaintiff's and Class Members property rights to make exclusive use of their individually-identifiable health information for any purpose not related to the provision of their healthcare.

b. With the intent to (1) acquire Plaintiff's and the Class Members' individually identifiable health information without their authorization and without their healthcare providers or covered entities obtaining the right to share such information; and (2) use Plaintiff's and the Class Members' individually-identifiable health information without their authorization.

283. Plaintiff and the Class Members have suffered damages because of Billings Clinic's violations of the ECPA that include:

a. Billings Clinic eroded the essential, confidential nature of the provider-patient relationship;

b. Billings Clinic failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information;

c. Billings Clinic derived valuable benefits from using and sharing the contents of Plaintiff's and the Class Members' communications on its Website without their knowledge or informed consent, and without providing any compensation for the information it used or shared;

d. Billings Clinic's actions deprived Plaintiff and the Class Members of the value of their individually identifiable health information;

e. Billings Clinic's actions diminished the value of Plaintiff's and the Class Members' property rights in their individually identifiable health information; and;

f. violating Plaintiff's and the Class Members' privacy rights by sharing their individually identifiable health information for commercial use.

284. For Billings Clinic's violations set forth above, Plaintiff and the Class Members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [Billings Clinic] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520.

285.   Unless enjoined, Billings Clinic may continue to commit the violations of law alleged here.

286.   Plaintiff wants to continue to communicate with her healthcare providers through online platforms but has no practical way of knowing if her communications are being intercepted and disclosed to Google and other third parties and thus continues to be at risk of harm from Defendant's conduct.

287.   Pursuant to 18 U.S.C. § 2520, Plaintiff and the Class Members seek monetary damages for the *greater of* (i) the sum of the actual damages suffered by the Plaintiff and any profits made by Billings Clinic as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

**COUNT II**
**NEGLIGENCE**

288.   Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

289.   Defendant owed a duty to Plaintiff and the Class Members to exercise due care in collecting, storing, safeguarding, and preventing any disclosure of their Private Information. This duty included but was not limited to: (a) preventing Plaintiff's and Class Members' Private Information from being disclosed to unauthorized third parties; and (b) destroying Plaintiff's and Class Members' Private

Information within an appropriate amount of time after it was no longer required by Defendant.

290.   Defendant's duties to use reasonable care arose from several sources, including those described below. Defendant had a common law duty to prevent foreseeable harm to others, including Plaintiff and Class Members, who were the foreseeable and probable victims of any data misuse, such as disclosure of Private Information to unauthorized parties.

291.   Defendant had a special relationship with Plaintiff and Class Members, which is recognized by laws and regulations, including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members resulting from unauthorized disclosure of their Private Information to third parties such as Google. Plaintiff and Class Members were compelled to entrust Defendant with their Private Information. At relevant times, Plaintiff and Class Members understood that Defendant would take adequate data storage practices to safely store their Private Information. Only Defendant had the ability to protect Plaintiff's and Class Members' Private Information collected and stored on Defendant's websites.

292.   Defendant's duty to use reasonable measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or

91

unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of [PHI]." 45 C.F.R. § 164.530(c)(1).

293. Billings Clinic's conduct as described above constituted an unlawful breach of its duty to exercise due care in collecting, storing, and safeguarding Plaintiff's and the Class Members' Private Information by failing to protect this information.

294. Plaintiff and the Class Members trusted Billings Clinic and in doing so provided Defendant with their Private Information, based upon Defendant's representations that it would not use or disclose their medical information without written authorization. Defendant failed to abide by these representations.

295. Billings Clinic breached its duty in this relationship to collect and safely store Plaintiff's and Class Members' Private Information.

296. Plaintiff's and the Class Members' Private Information would have remained private and secure had it not been for Defendant's wrongful and negligent breach of its duties. Defendant's negligence was, at least, a substantial factor in causing Plaintiff's and Class Members' Private Information to be improperly accessed, disclosed, and otherwise compromised, and in causing Plaintiff and the Class Members other injuries because of the unauthorized disclosures.

297.  The damages suffered by Plaintiff and the Class Members were the direct and reasonably foreseeable result of Defendant's negligent breach of its duties to maintain Users' Private Information. Defendant knew or should have known that its unauthorized disclosure of highly sensitive Private Information was a breach of its duty to collect and safely store such information.

298.  Defendant's negligence directly caused significant harm to Plaintiff and the Class. Specifically, Plaintiff and Class Members are now subject to their sensitive information being accessed by unauthorized parties, which may lead to significant harms.

299.  Defendant had a fiduciary duty to protect the confidentiality of its communications with Plaintiff and Class Members by virtue of the explicit privacy representations Defendant made on its websites to Plaintiff and members of the Class.

300.  Defendant had information relating to Plaintiff and Class Members that it knew or should have known to be confidential.

301.  Plaintiff's and Class Members' communications with Defendant about sensitive Private Information and their status as patients of Defendant were not matters of general knowledge.

302.  Defendant breached its fiduciary duty of confidentiality by designing its data protection systems in a way to allow for a data breach of a massive caliber.

303. At no time did Plaintiff or Class Members give informed consent to Defendant's conduct.

304. As a direct and proximate cause of Defendant's actions, Plaintiff and Class Members suffered damage in that the information they intended to remain private is no longer so and their Private Information was disclosed to, tracked, and intercepted by third-party Internet tracking companies, including Google, without their knowledge or consent.

## COUNT III
## UNJUST ENRICHMENT

305. Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

306. Billings benefits from Plaintiff and Class Members and unjustly retained those benefits at their expense.

307. Plaintiff and Class Members conferred a benefit upon Defendant Billings in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible and other benefits, including substantial monetary compensation.

308.   That is, in exchange for disclosing the PII of its patients, Defendant is compensated by Google and other third-parties in the form of enhanced advertising services and more cost-efficient marketing on third-party platforms. By utilizing the third-party Tracking Tools, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

309.   Plaintiff and the Class Members provided their Private Information to Billings in reliance on Billings' privacy representations that it would not disclose their health information or personally identifiable information to third parties for marketing or other unauthorized purposes. Plaintiff and Class Members did not intend to confer the advertising, analytics, retargeting, or other commercial benefits that Billings Clinic obtained through the unauthorized disclosure of their Private Information.

310.   Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

311.   The benefits that Defendant Billings derived from Plaintiff and Class Members were not offered by Plaintiff and Class Member gratuitously and rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Montana for Defendant to be permitted to retain any of the

revenue or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

312. Defendant Billings should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**<u>COUNT IV</u>**
**VIOLATION OF THE MONTANA HEALTH CARE INFORMATION ACT**
**Mont. Code Ann. §§ 50-16-801, et seq.**

313. Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

314. The Montana Health Care Information Act ("MHCIA"), Mont. Code Ann. §§ 50-16-801, *et seq.*, protects the confidentiality of health care information held by Montana health care providers subject to HIPAA and imposes affirmative statutory duties to safeguard such information and restrict its disclosure absent patient authorization.

315. The Montana Legislature expressly found that "health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy and health care or other interests." Mont. Code Ann. § 50-16-801(1).

316. The Legislature further found that "it is in the best interest of the citizens of Montana to have certain requirements, with respect to the use or release of health care information by health care providers, that are more restrictive than or additional to the health care privacy protections of HIPAA." Mont. Code Ann. § 50-16-801(4).

317. Billings Clinic is a "health care provider" within the meaning of the MHCIA and is subject to the health care information privacy protections of HIPAA. Billings Clinic is therefore subject to the disclosure restrictions and affirmative duties imposed by Mont. Code Ann. §§ 50-16-801, et seq.

318. Plaintiff's and Class Members' communications with Billings Clinic through its Website, including the medical conditions they searched, the providers whose profiles they viewed, the facility locations they selected, the free-text queries they entered, appointment-request activity, patient-portal login activity, prescription-refill activity, bill-payment activity, and the associated URLs, IP addresses, cookie identifiers, and device identifiers transmitted contemporaneously with those interactions, constitute "health care information" within the meaning of the MHCIA because they identify Plaintiff and Class Members and relate to their past, present, or future physical or mental health, condition, or the provision of health care to them.

319. Billings Clinic disclosed Plaintiff's and Class Members' health care information to Google, StackAdapt, and other third-party advertising and analytics

vendors by intentionally embedding the Tracking Tools on its Website and by programming its Website to transmit patient communications and identifiers to those third parties.

320. Plaintiff and Class Members never authorized Billings Clinic to disclose their health care information to Google, StackAdapt, or any other third-party advertising or analytics vendor. Billings Clinic never obtained a written authorization from Plaintiff or Class Members as required by the MHCIA.

321. Billings Clinic's disclosures were not permitted by any exception under the MHCIA and were not required by any other provision of Montana or federal law. The disclosures were made to advance Billings Clinic's commercial marketing, retargeting, and advertising interests, not to provide health care to Plaintiff or Class Members and not for any purpose recognized as permissible under Mont. Code Ann. §§ 50-16-801, et seq.

322. Billings Clinic's Notice of Privacy Practices and Site Privacy Policy affirmatively represented that Billings Clinic would not share health-related information with third parties for marketing purposes and that identifying information would not be linked to individually identifiable data. Those representations misled Plaintiff and Class Members about the actual scope of Billings Clinic's disclosures and further evidence Billings Clinic's failure to comply with the MHCIA's requirements for authorization and consent.

323. Billings Clinic's conduct was intentional. Billings Clinic knowingly chose to embed the Tracking Tools on its Website, knowingly configured them to intercept and transmit patient communications, and knowingly benefited from those disclosures through enhanced advertising, retargeting, and analytics services.

324. In the alternative, Billings Clinic's conduct was grossly negligent because Billings Clinic knew or should have known that the Tracking Tools intercepted and disclosed patient communications and identifiers to third parties, and Billings Clinic failed to take reasonable steps to detect, remove, or disable those technologies despite widely publicized federal and state guidance concerning the unlawful use of tracking technologies on healthcare websites.

325. As a direct and proximate result of Billings Clinic's violations of the MHCIA, Plaintiff and Class Members have suffered injury, including but not limited to invasion of privacy, loss of the confidentiality of their health care information, diminution of value and loss of control of their health care information, and the continued and ongoing risk of unauthorized use of that information by third parties.

326. Pursuant to Mont. Code Ann. § 50-16-817, Plaintiff and Class Members are entitled to actual damages, statutory damages not to exceed $5,000 per Class Member, reasonable attorneys' fees, and costs.

327. The MHCIA does not provide the exclusive remedy for the unauthorized disclosure of health care information.[54] Accordingly, Plaintiff pleads this count in addition to, and not in the alternative to, her and the Class Members' other claims.

## COUNT V
## INVASION OF PRIVACY

328. Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

329. Montana recognizes an independent common-law tort of invasion of privacy, which protects an individual from a wrongful intrusion into their private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

330. Montana law recognizes that medical records and health information are "quintessentially private and deserve the utmost constitutional protection." *State v. Bilant,* 2001 MT 249, ¶ 17, citing *State v. Nelson*, 283 Mont. 231, 242, 941 P.2d 441, 448 (1997); *see also* Mont. Code Ann. § 46-4-301(3) (medical records and information are recognized under Montana law as "constitutionally protected material").

---

[54] *See Harrington v. Madison Cnty.*, 2021 U.S. Dist. LEXIS 233045, at *7-8 (D. Mont. Dec. 6, 2021).

331.   Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Billings Clinic, in the medical conditions they searched, the providers they researched, the facility locations they selected, the appointment-request activity they conducted, the patient-portal activity they engaged in, and the associated identifiers transmitted contemporaneously with those interactions.

332.   That expectation of privacy was reasonable and objectively justified by (i) Billings Clinic's status as a HIPAA-covered healthcare provider; (ii) Billings Clinic's express representations in its Notice of Privacy Practices and Site Privacy Policy that it would not share health information for marketing purposes without written authorization and that identifying information would not be linked to individually identifiable data; (iii) Montana's constitutional right of privacy under Article II, § 10 of the Montana Constitution; (iv) Montana statutory law protecting health care information under the MHCIA; (v) HIPAA and its implementing regulations; and (vi) the well-recognized confidentiality of the patient-provider relationship.

333.   Billings Clinic intruded upon Plaintiff's and Class Members' private activities by intentionally deploying, configuring, and maintaining the Tracking Tools on its Website, thereby causing Plaintiff's and Class Members' private health-related communications with their healthcare provider to be intercepted and

disclosed to Google, StackAdapt, and other third-party advertising and analytics vendors.

334. Billings Clinic's intrusion occurred in each instance in which Plaintiff and Class Members interacted with the Website, including when they searched for medical conditions, viewed providers' profiles, requested appointments, logged into PatientConnect, refilled prescriptions, paid bills, or otherwise navigated the Website.

335. Billings Clinic's intrusion was intentional. Billings Clinic knowingly installed and configured the Tracking Tools, knowingly programmed its Website to transmit patient communications and identifiers to third parties, and knowingly benefited from those transmissions in the form of enhanced advertising, retargeting, and analytics services.

336. Billings Clinic's intrusion is highly offensive to a reasonable person. A person of ordinary sensibilities would be outraged to learn that a trusted healthcare provider surreptitiously transmitted the details of their medical searches, provider selections, appointment activity, and portal logins to a global advertising company for use in commercial retargeting.

337. Billings Clinic's intrusion caused Plaintiff and Class Members mental suffering, shame, humiliation, anxiety, and loss of trust in their healthcare provider, as well as invasion of privacy, diminution of the value of their private information, and the continued and ongoing risk of misuse of that information by third parties.

338.   Plaintiff and Class Members are entitled to recover general and special damages, together with such punitive damages as may be appropriate, for Billings Clinic's invasion of their privacy.

**COUNT VI**
**NEGLIGENCE *PER SE***

339.   Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

340.   Plaintiff pleads this count in the alternative to, and in addition to, her other negligence claim.

341.   Billings Clinic owed Plaintiff and Class Members statutory and regulatory duties to protect the confidentiality of their health care information and to refrain from disclosing that information to third parties without patient authorization.

342.   Those statutory and regulatory duties are established by, among other authorities:

   a. the Montana Health Care Information Act, Mont. Code Ann. §§ 50-16-801, *et seq.*, which restricts the disclosure of health care information by Montana health care providers subject to HIPAA;

   b. Mont. Code Ann. § 46-4-301(3), which recognizes medical records and information as "constitutionally protected material";

343. These statutes and regulations were enacted for the specific purpose of protecting the confidentiality of patients' health care information and preventing the unauthorized disclosure of that information to third parties.

344. Plaintiff and Class Members are members of the class of persons the foregoing statutes and regulations were designed to protect, namely patients of healthcare providers whose confidential health care information is entrusted to those providers.

345. The harms Plaintiff and Class Members have suffered, including the unauthorized disclosure of their health care information to third-party advertising and analytics vendors, the invasion of their privacy, and the loss of control over their sensitive medical data, are precisely the harms these statutes and regulations were designed to prevent.

346. Billings Clinic breached these statutory and regulatory duties by:

    a. installing the Tracking Tools on its Website in a manner that resulted in the impermissible disclosure of patient health care information to Google, StackAdapt, and other third parties;

    b. failing to obtain written authorization from Plaintiff and Class Members before disclosing their health care information to third parties for marketing purposes;

104

c. failing to implement reasonable administrative, technical, and physical safeguards to protect the confidentiality of patient health care information transmitted through its Website;

d. failing to review and modify its Website and marketing programs to prevent unauthorized disclosures of patient health care information;

e. failing to identify and respond to known and reasonably knowable disclosures of protected health information through the Tracking Tools; and

f. failing to disclose to Plaintiff and Class Members that their health care information was being transmitted to third-party advertising and analytics vendors.

347. As a direct and proximate result of Billings Clinic's breaches of these statutory and regulatory duties, Plaintiff and Class Members have suffered injury, including but not limited to invasion of privacy, diminution of value and loss of control of their protected health care information, statutory damages, and the continued and ongoing risk of misuse of their health care information by third parties.

348. Billings Clinic's conduct constitutes negligence per se under Montana law.

349.   Plaintiff pleads negligence per se not as a private right of action under Montana statutory authorities, but rather to demonstrate the standard of care applicable to Billings Clinic's handling of Plaintiff's and Class Members' health care information. *See Harrington v. Madison Cnty.*, 2021 U.S. Dist. LEXIS 233045, at *5-8 (D. Mont. Dec. 6, 2021) (recognizing that a plaintiff may rely on HIPAA and Montana statutory authorities to demonstrate a privacy interest and a duty of care without asserting a private right of action under the same statutory authorities).

## COUNT VII
## VIOLATION OF MONTANA'S CONSTITUTIONAL RIGHT TO PRIVACY
### Mont. Const. art. II, § 10

350.   Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

351.   Article II, § 10 of the Montana Constitution provides: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."

352.   Montana's constitutional right of privacy is one of the strongest in the nation and provides protections independent of, and in many respects greater than, those afforded under federal law.

353.   Montana courts have repeatedly recognized that medical records and health information fall within the core of Montana's constitutional privacy protection. *See State v. Bilant*, 2001 MT 249, ¶ 17 ("medical records are

106

quintessentially private and deserve the utmost constitutional protection"); *State v. Nelson*, 283 Mont. 231, 242, 941 P.2d 441, 448 (1997); Mont. Code Ann. § 46-4-301(3) (referring to "medical records or information" as "constitutionally protected material").

354. As a Montana healthcare provider entrusted with the confidential medical information of Montana residents, Billings Clinic occupies a position uniquely subject to Montana's constitutional privacy protections. Plaintiff and Class Members had a reasonable expectation of privacy in the health-related communications and information they exchanged with Billings Clinic through its Website, and society is prepared to recognize that expectation as reasonable.

355. Billings Clinic infringed on Plaintiff's and Class Members' Montana constitutional right of privacy by:

      a.    intentionally embedding the Tracking Tools on its Website;

      b.    programming and configuring its Website to transmit Plaintiff's and Class Members' health-related communications and personal identifiers to Google, StackAdapt, and other third-party advertising and analytics vendors;

      c.    failing to obtain informed consent or written authorization from Plaintiff and Class Members before disclosing their health-related communications; and

d.      affirmatively misleading Plaintiff and Class Members through its Notice of Privacy Practices and Site Privacy Policy about the nature and scope of information shared with third parties.

356.  Billings Clinic's infringement of Plaintiff's and Class Members' constitutional right of privacy was undertaken to advance its own commercial marketing, retargeting, and advertising interests and was not supported by any compelling justification.

357.  Montana's constitutional right of privacy exists independent of HIPAA, is not preempted by HIPAA, and complements HIPAA's protections. *See Harrington v. Madison Cnty.*, 2021 U.S. Dist. LEXIS 233045, at *5-8 (D. Mont. Dec. 6, 2021) (recognizing Montana's independent constitutional privacy protection for medical information and holding that HIPAA does not preempt complementary state-law protections).

358.  Billings Clinic's conduct constitutes a tortious invasion of Plaintiff's and Class Members' Montana constitutional privacy rights, actionable through Montana's recognized privacy torts and complementary state-law causes of action.

359.  As a direct and proximate result of Billings Clinic's infringement of Plaintiff's and Class Members' Montana constitutional privacy rights, Plaintiff and Class Members have suffered injury, including but not limited to invasion of privacy, mental suffering, shame, humiliation, anxiety, loss of trust in their healthcare

108

provider, diminution of value and loss of control of their private information, and the continued and ongoing risk of misuse of their information by third parties.

360.   Plaintiff and Class Members are entitled to recover damages, together with such other and further equitable relief as the Court may deem appropriate to remedy Billings Clinic's infringement of their Montana constitutional privacy rights.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Lydia Brester, on behalf of herself and all those similarly situated, respectfully prays for judgment in her favor and against Defendant Billings Clinic as follows:

1.   For an Order certifying this action as a class action and appointing Plaintiff Lydia Brester as Class Representative and Plaintiff's counsel as Class Counsel;

2.   For equitable relief enjoining Billings Clinic from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and other Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and other Class Members;

3.   For equitable relief compelling Billings Clinic to utilize appropriate methods and policies with respect to consumer data collection, storage

and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;

4.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Billings Clinic's wrongful conduct;

5.  For an award of actual damages, compensatory damages, statutory damages, nominal damages and statutory penalties, in an amount to be determined as allowable by law;

6.  For an award of statutory damages under the Electronic Communications Privacy Act, 18 U.S.C. § 2520, the greater of (i) the sum of the actual damages suffered by Plaintiff and Class Members and any profits made by Billings Clinic as a result of its violations, or (ii) statutory damages of the greater of $100 per day for each violation or $10,000 per Class Member;

7.  For an award of statutory damages under the Montana Health Care Information Act, Mont. Code Ann. § 50-16-817, actual damages plus statutory damages not to exceed $5,000 per Class Member;

8.  For an award of punitive damages as allowable by law;

9.  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

10.   Pre- and post-judgment interest on any amounts awarded; and

11.   All such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Date: July 14, 2026                                    Respectfully submitted,

/s/ *Michael J. Casas*
James B. Zouras (*pro hac vice forthcoming*)
Ryan F. Stephan (*pro hac vice forthcoming*)
Michael J. Casas (*pro hac vice forthcoming*)
Gillian Kimmons ((*pro hac vice forthcoming*)
**STEPHAN ZOURAS, LLC**
222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550
312.233.1560 *f*
Firm ID: 43734
jzouras@stephanzouras.com
rstephan@stephanzouras.com
mcasas@stephanzouras.com
gkimmons@stephanzouras.com

/s/ *Keif Storrar*
Keif Storrar
Bradley R. Jones
**DOUBEK, PYFER & STORRAR, PLLP**
307 N. Jackson St.
Helena, Montana 59601
406-442-7830
406-442-7839 *f*
keif@lawyerinmontana.com
bradley@lawyerinmontana.com
*Attorneys for Plaintiff and the Putative Class*

111